of America. Case number 25-5111, Ute Indian Tribe of the Uintah and Ouray Indian Reservation imbalance v. United States of America, Hedda. Mr. Rasmussen for the imbalance, Mr. Ray for the employees. Good morning, counsel. Mr. Rasmussen, please proceed when you're ready. Good morning, Your Honor. May it please the court, my name is Jeffrey Rasmussen. I am the attorney for the Ute Indian Tribe of the Uintah and Ouray Reservation, and with me at counsel table is co-counsel, Mr. Patterson, and also here is a representative from the Tribes Council, Cleveland Murray. We are here today on what could be the last, I think, large Indian law land case in the country, and it has a kind of a unique history of why it still is in existence, but we are here now to determine whether the tribe had compensable title to land that is currently owned by the United States on the tribe's existing reservations, and that existing reservation is, it's about 1.9 million acres. The United States still owns 1.5 million acres of that land, and under the proper interpretation of the 1880 Act that we discussed at length in our brief, the United States was the broker for sale of that land, and it had then the duty to place proceeds from those sales of that land that was set apart for the Uncompahgre Band in Tetras, and the estates in Indian law are really very different from the estates in English law, and as we all learned in law school, there's all sorts of complicated estates under English law. Indian law has some of that same similarity in that it's really complex, but what we have as agreement in this case is, if the tribe had what we now refer to as compensable title, which is the lowest level of, really, of title that a tribe can have, that if it has compensable title, then that land can be restored under the Indian Reorganization Act, and so the issue is compensable title, and so the United States cites, for example, some dicta from Supreme Court cases where it's talking about ownership. That's talking about a different type of title. That's talking about trust title, and that's not what we're talking about here. What we're talking about here is compensable title, the lowest level, and so we look at the 1880 Act. The 1880 Act says that the tribe has compensable title. It defines, it's not using that term because that term is not used at that point in time in 1880, but that the tribe has, that this land will be set apart for the tribes. There'll be a boundary for this reservation. The president will create this reservation and create a boundary for it, and then the land that is so set apart, which is the Uncompahgre reservation, that land will then be like public lands except for that the tribe has the right to the proceeds from the sale, and that is then what later becomes, under the Indian Reorganization Act, compensable type. That is the definition of it, which is if the United States owns this land and it was a broker for sale of the land to the, to the, to non-Indians, as it was here, and then it can't sell the land, what do you do with it? And the Indian Reorganization Act says, well, if they didn't sell it, they have the authority to give it back to the tribe because it never sold, and here the Uncompahgre reservation, as we discussed in our brief, it's a very, very remote area. It is probably the most worthless land in the United States as far as agricultural uses or farming or irrigable lands. We've got 1,900, 1.9 million acres, and not more than 30% of it is irrigable even. None of it can support a crop without irrigation. It is barren, high desert rock. The United States has the Uncompahgre out there. But then we found out later that it had oil. It had significant oil. It has one of the better oil fields in the United States. And so the United States said, oh, well, we'll just keep that. We'll keep that land. We didn't sell it. We'll just keep it. We'll keep the money from it, and that's why we're here. So the plain meaning of the statute is the, is one of the two central issues in this case, is does this statute say that the tribe has the right to the proceeds from the sale of the land that was set apart? And the statute just explicitly says that, which is, we really expected we would be on the other, at the other table when we got up to appeal here. But for, when you say the statute just as explicitly says that, so you're talking about the 1880 Act? The 1880 Act. Yeah. And for it to explicitly say that, then you'd have to conclude that the relevant corpus of land is not the Colorado land, but it encompasses the future, the Utah land that had yet to be demarked. I don't think you have to say that. What you have to say is that the Uncompahgre was set apart. And when the statute refers to the land so set apart, the tribe will have compensable land, title to the land so set apart, that that then means that if they set apart the Uncompahgre outside of Colorado, that that's the compensable title attaches to that land. So the United States, really at oral argument in the court below, latched on to a footnote in the M opinion that's under review, where the M opinion says, you know, this could be more properly understood to refer to the Colorado lands. We, first of all, we don't agree with that. We discussed that in our brief. But second of all, that isn't the issue for the statutory interpretation in this case, because what we're talking about is the statute says the land so set apart, and the president is to send out a commission that find the land that they're going to move the Uncompahgre to. And at this point in 1880, and this is where the district court also got confused. At this point in 1880, that's what a reservation is. It is a line between the tribe, tribal members, and non-Indians. And non-Indians cannot cross that border, and tribal members can't cross that border either. It is to separate them. And that's what it was in 1880. And so the district court pulled in later concepts to talk about what happens a generation later, or 10 years later, when we start having this concept of a lot really coming to fruition. But in 1880, that is still what a reservation is. So the president sets apart the reservation, says, this is the land I'm setting apart under the statute. Here it is. Move them to that. They're moved to that land at gunpoint, to this barren rocky land. And they're told, this is your new reservation. And that reservation still exists today. And it is that reservation that was set apart by the president, and there's no act of Congress that ever then revoked that. So the land that was set apart is the land that we're talking about here today. Whether there would be a right to compensation for land in Colorado, we view as a wholly separate issue then. And where the district court then said, well, if it's the land in Colorado, it can't be the land in Utah. We disagree with that. Because the statute is referring to the land that is set apart. The land that is set apart is that land in Utah. So our view is that the statute itself is very, very clear. But I wanted to also... Let me ask you on that point, though. When you look at the text of the statute, isn't it equally clear that it's talking about Colorado at that point? No, I don't believe it is equally clear. I think that when it's talking about the land that is set apart, it's talking about the land that is going to be set apart for these two reservations. The one down for Southern Ute, and the one for the Uncompahgre. That's the land it's referring to. There are other provisions... Let me ask you, counsel, so I'm clear. Yeah. The tribe was in one part of Colorado that it liked very much. All right. Yes. Then the government commissioner on Indian Affairs wanted to open up that land. So it had to find another place for the Indians. Right. So it found this other place in Colorado, this barren rock place. And that's what the 1880 Act is talking about, isn't it? No. I mean, I know it has a reference to Colorado or elsewhere. Right. The Act itself is referring to not barren land, but it's referring to the land that is probably one of the more productive agricultural lands in Colorado, where Grand Rapids... Not Grand Rapids, Grand Junction is today. So it's referring to, we're going to move you to the Grand Junction area or to land in Utah. But as everybody has sort of recognized, that was more of a pretense of, oh, we'll move you to Colorado, because when the commission comes out there and looks, they say, oh, there's no agricultural land here in this area that's now farmland in Colorado. So we're going to move you to the Uncompahgre. And that was relatively clear to everybody at the time that that was what was going to happen, because the Colorado was adamant that the Utes had to be removed from Colorado. And so what we have is there's a reference to land in Colorado or Utah. And once that reservation is established there, then that compensable title attaches to that reservation. And the question is, what does the word there mean? And you say it means Colorado land. No, we say that the land, it's the land that is set apart based upon that 1880 Act. So it is the land that they're going to move the Uncompahgre's to. And they only moved the Uncompahgre's in that one time. They moved them from Colorado to the reservation in Utah. And it is that reservation that is established. I got the facts wrong. I thought the tribe was in Colorado, which was very desirable for the tribe. Then the federal government decided it wanted to move the tribe elsewhere in Colorado. And it did move the tribe, or it expected the tribe to move to Colorado. And the tribe basically said, no, no, no, we don't want to go. And then Congress came along and authorized the Commissioner on Indian Affairs to set aside these allotments. But they were going to be in Idaho. Utah. In Utah. Yeah. So I thought there were three stages here, not just two. No, there were only the two. So they were in the areas in Colorado that was part of their reservation in Colorado. The statute said, the 1880 Act says, we're going to set apart a new reservation for you. You're being kicked off this reservation. We're going to set apart a new reservation for you. And you are going to move to it. And then the Commissioner of Indian Affairs, they send out their survey team. And they say, that new reservation is going to be in Utah. It's going to be the Uncompahgre, which is still there today, the Uncompahgre reservation. And that's where they then moved them to. And so that is why that is the land that was set apart in compliance with that 1880 Act. So it was just two places. Colorado, now we're moving you to Utah. I did want to briefly touch on one other issue besides the plain meaning, and that is the Indian Canons. And here we've got the 1880 legislative history. We've got the 1882 Proclamation. We've got the 1887 Act that is premised on the tribe having compensable title. We have the 1891 and 1892 Acts that didn't pass regarding Gilsonite, that again are premised on the tribe having compensable title. We have the 1894 Act, which is again premised on the tribe having compensable title. It says that to allot this land, we're going to have to reach an agreement with the Ute tribe, and that's then based upon compensable title. We've got the 1887 Act, which doesn't contain the language taking the reservation. So in 1880, under the Indian Canons, the concept is if there's ambiguity, it's interpreted in favor of the tribe. We've got this string of Acts right afterwards that is all premised on, and the 1880 legislation itself couldn't be clear. This is all premised on. We can't just take a tribe, make them landless. We've got to give them compensation. So that's why the Ute tribe also understood the legislation under the Indian Canons to be that they would have compensable title to this land. And the United States kind of alludes to Skidmore deference in its brief. It doesn't actually talk about it, but does cite it in their standard of review. This court has held that even the Indian Canons even prompt Chevron deference, or prompt Chevron deference, I guess I should say. And Skidmore deference isn't really even a deference. So again, what we've got is the agency is trying to rely on its own analysis rather than the statute, and it's trying to actually rely on its prior. Really, the core of its argument really goes back to just an anachronism, that they previously argued the Uncompahgre Reservation did not exist, and then they wouldn't have had to restore it under the IRA. If there's not a reservation, it doesn't have to be restored. So that was how we got here was that history, and now they admit the Uncompahgre Reservation still exists to this day. They finally accepted the Utah decisions, and that gutted their rationale, but they won't give up because this land has worth a lot of money now. They didn't think it was. Thank you. Thank you, counsel. Let me make sure my colleagues don't have questions, additional questions at this time. We will give you a little time for rebuttal. Thank you. May it please the Court. Mary Gabrielle Sprague for the United States. The statute that Mr. Rasmussen is describing is not the 1880 Act that was passed by Congress. Just to begin with the fundamental question Judge Rogers asked about the scheme, she's absolutely correct. The Utes were in the mountains of Colorado. This area near Grand Junction, Colorado at the confluence of the Colorado River and the Gunnison River was at the western end of what they claimed to be their homeland, and they were satisfied to go to that area which had fertile land for farming. That was their expectation from all evidence. That was Congress's expectation. There were people calling to remove all the Utes from Colorado and send them to Utah or elsewhere, but that's not what Congress decided. Presumptively, the Uncompahgre Band could remain in Colorado where they wanted to be. What they expected was what the 1880 Act provides, which is that the commissioners, first of all, who were appointed by the President would do a census of all the members of the band. According to the 1880 Act, depending on your age and your family status, you got certain acreages for your allotment, either 160 acres or 80 acres. So with the census and this specification of the acreage for allotments, the commissioners could decide how much land they needed. They would then look for that land, presumptively for the Uncompahgre in the Grand Junction area, but if not, then in Utah. And the land that was to be set apart was enough land, sufficient land for the acreage needed for these allotments. And then once that land, the sufficient acreage for these allotments was set apart, then they would draw the internal boundary lines and assign the different parcels to the different members. The other type of land that was to be set apart were relatively small parcels for agency buildings, schools and such that would support this new agricultural community of Uncompahgre Indians. So that was the scheme. That is what is written into the statute. It came as a surprise to the band that they were going to be relocated to Utah. And this was a result in 1881, the commissioners looked around, they said there was not sufficient land where they wanted to live in Colorado. The tribe has called that a fraud in any event. But in writing this report, the Commissioner of Indian Affairs for the Secretary of the Interior said, well, we're going to take them to Utah, but it's rough going there. And so we're going to set apart a larger parcel of land within which these allotments would be made. It reservation was a temporary arrangement to allow the Uncompahgre to get settled and the land to be allotted. Now, the 1880 Act is all about allotment. Nowhere in the Act does it say that a replacement reservation would be provided for the Uncompahgre band. The idea was to terminate the common ownership of a tribe for its members and replace it with individual parcels for the members, individual allotments. And this scheme has twice been described by the Supreme Court interpreting the 1880 Act. In 1947, in Confederated Bands of Ute Indians versus United States and in 1971 in the Southern Ute, United States versus Southern Ute Tribal Band of Indians. Confederated Bands is 330 U.S. 169. The Southern Ute case is 402 U.S. 159. And both of those cases surveying the history of the Colorado Reservation and interpreting the 1880 Act held that the as we said in our brief, the quoting, the only lands for which Congress agreed in 1880 to compensate the Indians were those that the title to which the Indians then released and conveyed to the United States. They could only release and convey the lands that belonged to them and only the lands given to them by the original 1868 treaty belonged to them. And on the tribe's point of the applicability of the Indian canon, it's well established that that does not change. It cannot be used to change the clear meaning of Congress. And the Supreme Court held that the 1880 Act was clear and said at page 179, their alleged understanding can't be imputed to Congress in the face of plain language and a rather full legislative history indicating that the 1880 Act neither conveyed nor ratified conveyance of these lands. While it has long been the rule that a treaty with Indians is to be construed so as to carry out the government's obligation in accordance with the fair understanding of the Indians, we cannot under the guise of interpretation create presidential authority where there was none nor rewrite congressional acts so as to make them mean something they obviously were not intended to mean. The tribe's premises, it puts forward, of how this Act operates is simply incorrect. Their premise is that the Act directed land to be set apart for the Uncompahgre Band in Utah for a reservation. That, there is no statement to that effect in the Act. It was all about allotments. It was terminating tribal ownership, replacing it with individual ownership. The tribe says it replied brief 12 that the concept of allotment was vaguely referenced in the Act. That's just not true. The agreement details the specifications of the allotment, as I said, the census to be taken, how many acres of agricultural land, how many acres of grazing land, depending on your age and family status. The only reservation, reference to reservations in that Act were to the Colorado Treaty Reservation and to the Uinta Reservation, which is west of the Uncompahgre Reservation in Utah, which is where the White River Utes were being relocated. The White River Utes were blamed for the Meeker Massacre and Congress decided they would be removed from Colorado and relocated on the Uinta Valley Reservation and given allotments there. But otherwise, the Uncompahgre were going to stay presumptively, the Southern Utes would stay presumptively. Because of later along with the Ute Mountain Utes. And the land, the second part of their premise that's false, is that the land that was to be set apart, these allotments, were not going to be sold. The point was those were the lands, they weren't going to be sold by the government. Those were the lands that the individual members would keep. And again, the 1880 Act specifies how that land would be managed. Those allotments would be inalienable for 25 years. That's to allow for the time for the supposed transition to civilization, agricultural life. The Act provides that after 25 years, and that would require apparently legislation to provide for patenting, after 25 years the individual members would get fee patents from the government. At that point, the members could then sell their land if they wished and the members would keep the money. But there's nothing anywhere in the Act that says land would be set apart for the band if that land were sold, it would then go to the band. So, I mean, there are many other details of Mr. Rasmussen's presentation and the tribe's brief that I believe are incorrect. I'd like to one that's not as apparent. So, in the reply brief, Mr. Rasmussen was talking about the 1894 Act, which is an Act which provided, because the original allotment didn't proceed as expected, Congress again in 1894 passed an allotment Act for the Uncompahgre reservation. And in the reply brief, it argues that the 1894 Act, section 22, directed the commission to be appointed by the president to seek an agreement through which the tribe would relinquish all interest in the land on the Uncompahgre reservation. This is in the at 28 Stat 337. As Mr. Rasmussen said today, that supports the idea that if you had to get the band's agreement for the allotment and the disposition of the unallotted lands, that suggests an understanding that the tribe had compensable title. But section 22 expressly applies only to the Uinta Indian reservation, the area to the west of the Uncompahgre reservation. It says nothing about the Uncompahgre reservation. And as we explained in the brief, the Uinta reservation, there is trust title, beneficial title, compensable title, they're all the same thing for this purpose. Because there was an 1864 statute that confirmed the 1861 executive order. So setting aside the Uinta Valley Reservation. So there's no question the Uinta Valley Reservation required that there was this title. But sections, the 1894 Act, sections 20 and 21 address the Uncompahgre reservation. And there is not one word in those sections requiring any agreement by the band for either the allotment or for the disposition of the unallotted lands. And that's because Congress knew of the difference between the Uinta reservation and the Uncompahgre reservation. The Uinta, they had beneficial title, trust title, compensable title. The Uncompahgre reservation, they were never granted that. Let me make sure my colleagues don't have any questions on that score or any other that you've gone over. Okay. Thank you. Thank you, counsel. Mr. Rasmussen, we'll give you two minutes for a rebuttal. Thank you, Your Honor. One of the key errors in the United States argument is their argument basically that the 1880 Act accomplished allotment. It did not. It contemplated subsequent acts of Congress. And as we cited, I believe it's page 201 of that statute. It contemplated that allotment would only occur after there were these subsequent statutes. Allotment wasn't a thing in 1880. This was, you was kind of, oh, we're trying to flesh out how we'll do this. 1887, Congress passes a law for allotment, the General Allotment Act. Then Congress then says, go to the Utes and see if you can get an agreement to get them to relinquish their homeland in Utah. So that, and as we discussed on our brief, the Supreme Court has always said, well, Congress was always intending to get rid of tribes completely, the whole of the United States history until, well, almost until the 1950s, 1960s. So that was, but we'll never interpret the Act of Congress to do that until there's an Act of Congress that actually does it. And that's why in the Tenth Circuit, the United States made this argument about the 1894 Act, and the Tenth Circuit rejected it and said, no, that isn't sufficient. They had the land, and this 1894 Act is not sufficient. This 1897 Act is not sufficient. And so those were based upon the contemplation that the tribe had the compensable title to that land. The United States keeps saying this was a temporary arrangement, but that point is that Congress may have thought in 1880 it was a temporary arrangement, but they never then passed the subsequent legislation that was required to take it. And that's why the tribe still has that compensable title to that land to this day, because it was set apart for them. And under the Indian canons, given that the United States is quibbling about the 1894 Act, but given all the other acts that they don't dispute before that, that were based upon the tribe having compensable title, the Commissioner of Indian Affairs saying the tribe had compensable title in 1892. For this court to say it's clear that the tribe did not have compensable title when everybody back then, the learned people studying this, said that the tribe did have compensable title for those first 12 years at least, even if the United States were right about 1894 and we don't believe they are, that would be under the Indian canons of construction, the required analysis. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Katsas; Rogers